UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

:

ANNE MARIE FORREST,                                     :

:

                               Plaintiff,              :

:

                 v.                                     :

:

CAROLYN W. COLVIN, *Acting Commissioner of*            :
*Social Security*,                                      :

:

                               Defendant.              :

:

------------------------------------------------------- X

```
┌────────────────────────────────┐
│ USDC SDNY                      │
│ DOCUMENT                       │
│ ELECTRONICALLY FILED           │
│ DOC #: _____          │
│ DATE FILED: June 22, 2016      │
└────────────────────────────────┘
```

15 Civ. 1573 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:[1]

Plaintiff Anne Marie Forrest ("Forrest" or "Plaintiff") filed this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security (the "Commissioner" or "Defendant") denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") based on a finding that Plaintiff did not meet the Act's criteria for disability. The parties have filed cross-motions for judgment on the pleadings. Because the Administrative Law Judge erred in applying the treating physician rule, did not adequately develop the record, and did not seek testimony from a vocational expert, Plaintiff's motion is granted and the Commissioner's motion is denied.

---

[1]     Deborah Sands, a rising second-year student at the University of Pennsylvania Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

## BACKGROUND[2]

Plaintiff filed an application for DIB and SSI on May 15, 2012, alleging that she has been disabled since January 15, 2009.  (SSA Rec. 130-39).  The Commissioner denied Plaintiff's application on September 4, 2012.  (*Id.* at 75).  Plaintiff subsequently requested and received a hearing before an Administrative Law Judge (the "ALJ"), pursuant to 20 C.F.R. § 404.929, at which she appeared with counsel on August 2, 2013.  (*Id.* at 43).  On November 26, 2013, the ALJ issued his decision denying benefits.  (*Id.* at 26-38).

### A.    Plaintiff's Occupational Background

From 1997 to 2009, Plaintiff worked as a Certified Nurse's Assistant ("CNA").  (SSA Rec. 177).  She stated that her job required her to feed, bathe, dress, and transfer patients, as well as assist them in the bathroom.  (*Id.* at 163).  Plaintiff testified at her administrative hearing that she was asked to resign from her job because she began to "ask for help more than [she] used to."  (*Id.* at 67).  According to Plaintiff, she was ultimately terminated when she reported her concern about an unsupervised patient.  (*Id.* at 67-68).  Based on the record before the Court, the reason for Plaintiff's termination appears to be unrelated to her alleged disability.

---

[2]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #9) filed by the Commissioner.  For convenience, Plaintiff's supporting memorandum is referred to as "Pl. Br." (Dkt. #12); Defendant's supporting memorandum as "Def. Br." (Dkt. #14); Defendant's memorandum in opposition as "Def. Opp." (Dkt. #16); and Plaintiff's memorandum in opposition as "Pl. Opp." (Dkt. #17).

At her hearing, Plaintiff stated that she looked for work as a CNA or a personal care assistant through 2010. (SSA Rec. 55-56). However, she claimed that she discontinued her search after she was repeatedly denied employment because of her medical conditions. (*Id.*).

## B.    Plaintiff's Health History

Plaintiff claims disability based on several medical conditions, including asthma, mitral valve disorder, hypertension, and bulging disc with sciatica. (SSA Rec. 152). She was treated for these impairments over a period of years by Dr. Gary C. Garfield at Sullivan Internal Medicine Group. (*Id.* at 348, 537, 547, 551, 584). In addition, Plaintiff's medical records indicate that she was hospitalized at Catskill Regional Medical Center on multiple occasions between 2009 and 2013. (SSA Rec. 245, 310, 405, 409, 459, 503, 587, 615).

### 1.    Plaintiff's Medical Visits Prior to Date of Alleged Onset

In 2000, Plaintiff underwent a mitral valve replacement. (SSA Rec. 239).[3] On July 12, 2005, Plaintiff visited Dr. Barry Scheinfeld for back pain radiating down her left leg. (*Id.*). Dr. Scheinfeld diagnosed Plaintiff with displacement of lumbar intervertebral disc without myelopathy and advised that she wear a back brace. (*Id.* at 240). Finally, in 2007 and 2008, Plaintiff visited Dr. Gary

---

[3]    Mitral valve replacement is surgery to replace the heart's mitral valve. The mitral valve is located between the left atrium and the left ventricle, and its function is to ensure that blood moves through the heart. Mitral valve surgery may be required if one's mitral valve has calcified so that blood does not move properly through the valve, or if it has loosened so that blood flows backward. *Mitral valve surgery — minimally invasive*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/007411.htm (last visited June 22, 2016).

Garfield on multiple occasions for asthma symptoms, high blood pressure, and severe chest pain.  (*Id.* at 296-303).

### 2.    Plaintiff's Medical Visits Subsequent to Date of Alleged Onset

On June 19, 2009, Plaintiff visited Dr. Garfield because of her asthma symptoms and mitral valve regurgitation.  (SSA Rec. 286).  At this visit, Plaintiff reported that she was using several medications, including Coumadin, Albuterol, and a nebulizer.  (*Id.*).  Plaintiff also reported that she had been fired from her job and lost her health insurance.  (*Id.*).  Dr. Garfield noted that Plaintiff had an elevated Prothrombin time ("PT") level, with an INR of 3.2.  (*Id.* at 287).[4]

Next, Plaintiff was admitted to Catskill Regional Medical Center from September 21 to 25, 2009.  (SSA Rec. 318).  She complained of shortness of breath, chest discomfort, productive cough, and a low-grade fever.  (*Id.*).  Upon initial examination, Plaintiff was found to have diffuse expiratory wheezes with a respiratory rate of 24 breaths per minute and oxygen saturation of 99%.  (*Id.* at 319).[5]  During her hospital stay, Plaintiff was treated with intravenous steroids, antibiotics, and bronchodilators.  (*Id.* at 318).  Plaintiff also received

---

[4]    Prothrombin time is a blood test that measures the time it takes for blood to clot.  The results of the test are presented as international normalized ratio ("INR").  A normal INR ranges from 0.8 to 1.1.  *Prothrombin time*, Medline Plus, https://www.nlm.nih.gov/medlineplus/ency/article/003652.htm (last visited June 22, 2016).

[5]    A normal respiratory rate ranges from 8-16 breaths per minute.  *Rapid shallow breathing*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/007198.htm (last visited June 22, 2016).  Normal blood oxygen levels range from 95-100%.  *Hypoxemia*, Mayo Clinic, http://www.mayoclinic.org/symptoms/hypoxemia/basics/definition/sym-20050930 (last visited on June 22, 2016).

an echocardiogram,[6] which revealed left ventricular hypertrophy[7] with preserved systolic function, a normal functioning mechanical valve at the mitral position, severe aortic regurgitation,[8] and mild tricuspid regurgitation with mild pulmonary hypertension.[9]  (*Id.* at 339).

When Plaintiff was admitted to the hospital, the attending physician reported that Plaintiff appeared depressed, and she admitted to alcohol abuse. (SSA Rec. 323).  On September 24, 2009, Dr. Khin Soe conducted a psychiatric evaluation.  (*Id.* at 323-24).  During the evaluation, Plaintiff reported she had a "low mood and a mild degree of anxiety" as a result of her unemployment.  (*Id.* at 323).  Dr. Soe subsequently diagnosed Plaintiff with "recurrent" and "moderate" major depression and advised her to seek counseling; however, Plaintiff refused antidepressant medications.  (*Id.*).

---

[6]   An echocardiogram uses sound waves to capture images of the heart.  *Echocardiogram*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/echocardiogram/ basics/definition/prc-20013918 (last visited June 22, 2016).

[7]   Left ventricular hypertrophy refers to the enlargement and thickening of the walls of the left ventricle, which is the main chamber responsible for pumping the heart's blood.  *Left ventricular hypertrophy*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/basics/definition/con-20026690 (last visited June 22, 2016).

[8]   Aortic regurgitation occurs when blood that was pumped out of the left ventricle leaks back into it.  *Aortic valve regurgitation*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/aortic-valve-regurgitation/basics/definition/con-20022523 (last visited June 22, 2016).

[9]   Tricuspid regurgitation occurs when the heart's tricuspid valve, located between the right atrium and the right ventricle, does not close tightly.  As a result, blood flows backward into the right atrium upon contraction of the right ventricle.  *Tricuspid regurgitation*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/000169.htm (last visited June 22, 2016).  Pulmonary hypertension is the medical term for high blood pressure in the arteries leading to the lungs.  *Pulmonary Hypertension*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/pulmonaryhypertension.html (last visited June 22, 2016).

5

On January 19, 2010, Plaintiff visited Dr. Garfield for her annual check-up and because of slight pain in her chest. (SSA Rec. 283).  Dr. Garfield recorded that Plaintiff suffered from an "asthma wheeze," which "never seem[ed] to go away." (*Id.* at 284).  He further noted that Plaintiff suffered from "severe fatigue" and "no energy," which he signaled could be indicative of depression. (*Id.* at 284-85).  Plaintiff again refused antidepressants at this visit. (*Id.* at 285).

On April 27, 2010, Plaintiff visited Dr. Garfield for a "pre-employment physical to see if she [could] work." (SSA Rec. 278).  Dr. Garfield noted that Plaintiff suffered from asthma or chronic obstructive pulmonary disease ("COPD"), hypothyroidism, and severe aortic insufficiency. (*Id.* at 280).  Despite these diagnoses, Dr. Garfield deemed Plaintiff "medically clear for employment as [a] CNA." (*Id.*).

Approximately one month later, on May 31, 2010, Plaintiff visited the emergency room at Catskill Regional Medical Center, where she was diagnosed with asthma exacerbation. (SSA Rec. 268).  Upon initial examination, Plaintiff had mid-chest pressure and a productive cough with white secretions. (*Id.*). The physician noted Plaintiff appeared in "mild respiratory distress" with bilateral wheezing and an increased expiratory phase. (*Id.* at 269).  Plaintiff was treated with Albuterol/Atrovent and Solumedrol. (*Id.* at 270).  Although the attending physician recommended Plaintiff be admitted to the hospital, Plaintiff declined and was discharged the same day, at which time her vital signs were normal and she appeared well. (*Id.*).

Plaintiff was next examined by Dr. Garfield on January 27, 2011, because of ear pain.  (SSA Rec. 273).  Dr. Garfield's notes indicated that Plaintiff suffered from impairments including asthma and hypothyroidism.  (*Id.* at 275).  Laboratory work revealed Plaintiff's PT level was elevated, with an INR of 3.5.  (*Id.* at 273).  Dr. Garfield prescribed Synthroid to Plaintiff at this visit. (*Id.* at 275).

Plaintiff next visited Catskill Regional Medical Center on June 5, 2011, reporting a one-week history of moderate dyspnea[10] and wheezing despite treatment with Albuterol.  (SSA Rec. 310-11).  Plaintiff exhibited bilateral expiratory wheezing and was diagnosed with asthma exacerbation.  (*Id.* at 312-13).  After being evaluated in the Emergency Department, Plaintiff was given aerosolized Albuterol, which provided significant relief.  (*Id.* at 312).  Plaintiff was discharged from the hospital the same day and was prescribed Albuterol, Flovent, and a four-day course of Prednisone.  (*Id.* at 313).

On March 8, 2012, Plaintiff visited Dr. Garfield for a follow-up visit.  (SSA Rec. 368).  At this visit, Plaintiff complained of asthma symptoms, fatigue, malaise, depression, anxiety, and a high stress level.  (*Id.*).  Dr. Garfield recorded that Plaintiff had no health insurance and was experiencing money problems.  (*Id.*).  During the general examination, Dr. Garfield found Plaintiff had a regular heart rate and rhythm, II/VI systolic murmur, diastolic murmur, and heart prosthesis with metallic heart sounds.  (*Id.*).  He noted no retractions

---

[10]    Dyspnea is an alternative term for shortness of breath.  *Breathing difficulty*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/003075.htm (last visited on June 22, 2016).

in Plaintiff's lungs, regular breathing rate and effort, and mild and scattered wheezes. (*Id.*). Dr. Garfield concluded that Plaintiff suffered from mitral valve disorder, aortic insufficiency, asthma, hypothyroidism, depression, tobacco abuse, hypertension, malaise, and fatigue. (*Id.*). Dr. Garfield increased Plaintiff's Coumadin prescription, and directed Plaintiff to begin Symbicort. (*Id.* at 369). Plaintiff declined antidepressant medications. (*Id.*).

The following month, on April 24, 2012, Plaintiff was admitted overnight to Catskill Regional Medical Center. (SSA Rec. 406). She exhibited diffuse wheezing and was diagnosed with asthma exacerbation. (*Id.*). She was treated with a nebulizer, oxygen, and intravenous Solumedrol. (*Id.*). Plaintiff was released the following day after reporting that she felt better. (*Id.*).

A month later, from May 22 to 28, 2012, Plaintiff was once again admitted to Catskill Regional Medical Center with the chief complaint of trouble breathing. (SSA Rec. 410). Throughout her hospitalization, Plaintiff "continued to have quite a bit [of] wheezing every time she was examined." (*Id.*). A chest X-ray indicated that Plaintiff had COPD. (*Id.*). A CT scan was performed because Plaintiff had an "episode of hemoptysis"[11] and "showed emphysematous changes." (*Id.*). She was diagnosed with COPD/asthma with exacerbation, valvular heart disease, Coumadin toxicity, and hemoptysis. (*Id.*).

On June 18, 2012, Plaintiff had a follow-up visit with Dr. Garfield. (SSA Rec. 542). Dr. Garfield's notes reiterated that Plaintiff had no health insurance

---

[11]   Hemoptysis refers to coughing up blood. *Coughing up blood*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/003073.htm (last visited on June 22, 2016).

and was experiencing money problems.  (*Id.*).  During the general examination, Dr. Garfield found that Plaintiff had lung wheezes, but her breathing rate and effort were regular.  (*Id.*).  Dr. Garfield advised Plaintiff to continue her medication regimen.  (*Id.* at 542-43).

On April 30, 2013, Plaintiff visited Dr. Garfield for another follow-up. (SSA Rec. 538).  Dr. Garfield again noted that Plaintiff did not have health insurance and was experiencing money problems.  (*Id.*).  She complained of chest pain, shortness of breath on exertion, weakness, fatigue, and malaise. (*Id.*).  Plaintiff exhibited lung wheezes, but her breathing rate and effort were normal.  (*Id.*).  During this visit, an electrocardiogram was performed in response to Plaintiff's chest pain, which came back with an "[a]bnormal" result. (*Id.*).  Dr. Garfield continued Plaintiff's Ventolin and Symbicort regimens, and increased her Albuterol and Prednisone dosages.  (*Id.* at 539).

Plaintiff again visited Catskill Regional Medical Center on June 7, 2013, appearing at the Emergency Department with complaints of asthma-related wheezing.  (SSA Rec. 591).  Plaintiff's lungs were "[c]lear to auscultation bilaterally"[12] with an "occasional expiratory wheeze."  (*Id.* at 592).  She was medicated with Albuterol aerosol and discharged from the hospital upon improvement.  (*Id.* at 593-94).

---

[12]   Auscultation refers to the process of listening to a patient's lungs during physical examination.  *Breath sounds*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/007535.htm (last visited on June 22, 2016).

9

Plaintiff was readmitted to Catskill Regional Medical Center from June 30 to July 5, 2013.  (SSA Rec. 616).  Upon admission, she complained that "even with her breathing treatments, she was unable to catch a full breath."  (*Id.* at 619).  Upon examination of her chest and lungs, Plaintiff exhibited bilateral inspiratory and expiratory wheezing.  (*Id.* at 620).  Her airway was patent,[13] and she had no tachypnea[14] or accessory muscle usage.  (*Id.*).  Plaintiff was diagnosed with asthma and chest pain.  (*Id.* at 623).  After being treated with systemic steroid and bronchodilator via nebulizer, Plaintiff improved gradually.  (*Id.* at 631).  An echocardiogram was performed, which showed 50-55% left ventricular ejection fraction,[15] moderate to severe aortic regurgitation, and normal functioning of Plaintiff's prosthetic mitral valve.  (*Id.*).  Plaintiff was discharged on July 5, 2013, when she was "feeling much better, symptomatically improved and [was] hemodynamically stable."  (*Id.*).

Two weeks later, on July 19, 2013, Plaintiff returned to Dr. Garfield's office.  (SSA Rec. 585).  Dr. Garfield noted that Plaintiff had not obtained health insurance and was still experiencing money problems.  (*Id.*).  She complained of shortness of breath, chest congestion, coughing, depression, weakness,

---

[13]   In the medical context, patent means "open" or "unobstructed."  *Patent*, The FreeDictionary, http://medical-dictionary.thefreedictionary.com/patent (last visited June 22, 2016).

[14]   Tachypnea is the medical term for rapid breathing.  *Transient tachypnea — newborn*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/007233.htm (last visited June 22, 2016).

[15]   Ejection fraction measures the amount of blood leaving the heart upon each contraction.  A left ventricle ejection fraction of 55 percent or higher is considered normal.  *Ejection fraction: What does it measure?*, Mayo Clinic, http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286 (last visited June 22, 2016).

fatigue, and malaise.  (*Id.*).  Dr. Garfield's general examination revealed lung wheezes, but Plaintiff's breathing rate and effort were regular.  (*Id.*). Dr. Garfield prescribed Singulair and Prednisone.  (*Id.* at 586).  Dr. Garfield noted that Plaintiff suffered from multiple comorbidities and had chronic fatigue and shortness of breath.  (*Id.*).  He stated that Plaintiff "[c]annot work at any occupation requiring physical labor."  (*Id.*).

In a letter dated July 30, 2013, Dr. Garfield wrote "To Whom It May Concern" that Plaintiff was "completely and permanently disabled, and cannot work."  (SSA Rec. 548).  Dr. Garfield indicated that Plaintiff "suffers from multiple medical conditions, including fatigue, depression, hypertension, and hypothyroidism."  (*Id.*).  He also noted Plaintiff's "prosthetic mitral valve requiring chronic anticoagulation" and "severe aortic insufficiency."  (*Id.*). Finally, Dr. Garfield stated that Plaintiff suffered from "severe, persistent asthma and COPD."  (*Id.*).

### 3.   Plaintiff's Consultative Examination by Dr. Ralph Alvarez

On July 31, 2012, Dr. Ralph Alvarez conducted a consultative internal medicine evaluation of Plaintiff.  (SSA Rec. 380).  Dr. Alvarez noted that Plaintiff had a history of asthma, which, according to Plaintiff, prevented her from walking more than a quarter of a mile without resting.  (*Id.*).  Dr. Alvarez further reported that Plaintiff had a history of back pain, which radiated down her left leg and at times caused numbness in her left foot.  (*Id.*).  Additionally, Dr. Alvarez stated that Plaintiff smoked between five and seven cigarettes per day.  (*Id.* at 381).  Dr. Alvarez added that Plaintiff cooked twice a week, and was

11

able to shower, bathe, and dress herself.  (*Id.*).  Plaintiff reported to Dr. Alvarez that a friend did cleaning, laundry, and shopping for her.  (*Id.*).

In his examination of Plaintiff's chest and lungs, Dr. Alvarez identified "few diffuse bilateral wheezes … on both lung fields."  (SSA Rec. 382).  Dr. Alvarez noted that Plaintiff's "percussion [was] normal," she had "[n]o significant chest wall abnormality," and she had "[n]ormal diaphragmatic motion."  (*Id.*).  Dr. Alvarez diagnosed Plaintiff with asthma, low back pain, a history of heart valve disease, hypertension, and a history of fatigue and anxiety.  (*Id.* at 383).  An X-ray of Plaintiff's lumbosacral spine indicated that she suffered from degenerative discs at L4/L5 and L5/S1.  (*Id.*).  Dr. Alvarez concluded in the medical source statement that Plaintiff had "no restrictions" based on his examination; however, Plaintiff "should avoid smoke, dust, and known respiratory irritants due to her history of asthma."  (*Id.* at 384).  Dr. Alvarez also noted that Plaintiff might benefit from a psychiatric evaluation. (*Id.*).

## C.     Plaintiff's Physical Residual Functional Capacity Assessment

One month after Dr. Alvarez's consultative examination, on August 31, 2012, G. LaMora conducted a physical residual functional capacity assessment of Plaintiff.  (SSA Rec. 390-95).[16]  LaMora found that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently.  (*Id.* at 391).  LaMora also noted that Plaintiff could sit and stand and/or walk for about six hours in an eight-hour workday.  (*Id.*).  LaMora indicated that Plaintiff had an unlimited

---

[16]     The record does not indicate LaMora's first name or title.

capacity to push and/or pull, apart from her lifting and carrying limitations. (*Id.*).  Additionally, LaMora found that Plaintiff could occasionally climb a ramp/stairs and ladder/rope/scaffolds as well as balance, stoop, kneel, crouch, and crawl.  (*Id.* at 392).  Finally, LaMora stated that Plaintiff "should avoid environments with known respiratory irritants."  (*Id.* at 393).  LaMora concluded that Plaintiff established no manipulative limitations, visual limitations, or communicative limitations.  (*Id.* at 392-93).

LaMora detailed Plaintiff's claim that she had difficulty lifting, standing, walking long distances, and climbing stairs.  (SSA Rec. 394).  LaMora also observed that "[Plaintiff] is unable to kneel, squat, has trouble reaching, and her [left] hand goes numb."  (*Id.*).  In addition, LaMora noted, Plaintiff "uses no assistive devices, drives a car but never goes out alone.  [Plaintiff] depends on friends to help with household chores.  [Plaintiff] is able to prepare light meals. [Plaintiff]'s allegations seem partially credible."  (*Id.*).  LaMora noted that the information from Plaintiff's treating sources did not significantly differ from LaMora's findings.  (*Id.*).

### D.    Plaintiff's Administrative Hearing

Plaintiff's administrative hearing was held on August 2, 2013.  (SSA Rec. 45).  Plaintiff testified that she was able to walk; however, she could "barely" climb stairs and must "hold on to the rails."  (*Id.* at 64).  She stated that she had "no regular breathing," and at times was confined to her living room because she could not go up the stairs.  (*Id.*).  Plaintiff further testified that she had a heart issue and previously had a valve replaced.  (*Id.* at 51).

Plaintiff also claimed to have a back problem, which prevented her from standing for a long period of time. (*Id.* at 58). Plaintiff denied suffering from depression but claimed to be "distressed." (*Id.* at 53). As Plaintiff stated, "I have no job. And I cannot get any help. I got to go to the doctors, and sometimes I don't have the money. When everybody got to help me, I feel bad sometimes." (*Id.*). Plaintiff reported to the ALJ that she had refused medication for depression as well as sleeping medications. (*Id.*).

As Plaintiff testified, she worked as a CNA prior to her termination in January 2009 (SSA Rec. 48, 60), and then continued to search for work throughout 2009 and 2010 (*id.* at 55). She explained that Dr. Garfield cleared her for work because she "asked him to, when there was no way of me getting [work], I realized it was a problem. He didn't want to, and I asked him, only because I wanted the benefit[.]" (*Id.*). Plaintiff stated that she was hired by one rehabilitation facility, though she was later deemed ineligible because of her physical condition. (*Id.*). Plaintiff claimed she was looking for jobs "[a]nywhere and everywhere"; however, she testified that she could not perform retail work or "jobs that weren't so difficult" because of her back problem. (*Id.* at 57-58). Plaintiff reported that at the time of the hearing she lived with friends and received financial support from family and friends. (*Id.* at 48). She also received unemployment benefits from 2009 to 2011. (*Id.* at 56-57).

Plaintiff testified that she was taking several medications for her breathing issues, including Prednisone, Albuterol, Ventolin, and Singulair. (SSA Rec. 50). She indicated that these medications caused fatigue and

14

irregular heartbeat.  (*Id.*).  She described her fatigue as "not the tired that you can sleep.  It's just you lay and you try to go to sleep, but you just toss and turn but [your] body's telling you you're tired."  (*Id.* at 63).  Plaintiff also stated that she took Coumadin, which caused bruising and cold hands and feet, and at one point she suffered from Coumadin toxicity.  (*Id.* at 52).  Plaintiff told the ALJ that, despite her breathing issue, she continued to smoke five cigarettes per day, and sometimes more if she was feeling stressed.  (*Id.* at 50-51).  Plaintiff reported that she used a nebulizer three or four times a day, and sometimes used it more frequently due to environmental conditions.  (*Id.* at 61).  In response to a question by her attorney, Plaintiff stated that there were an "awful lot of times" she did not go to the hospital or seek medical treatment because of her lack of health insurance.  (*Id.* at 62).  However, she would eventually seek medical assistance if she began to perspire and her heart started racing.  (*Id.*).

**E.    The ALJ's Opinion Denying Benefits**

On November 26, 2013, ALJ Robert Gonzalez rendered his decision on Plaintiff's application for DIB and SSI.  (SSA Rec. 29-38).  The decision applied the familiar five-step evaluation process set forth in the Social Security Act, 20 C.F.R. § 416.920(a).  (*Id.*).[17]  As an initial matter, the ALJ found that Plaintiff

---

[17]    The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical

met the Social Security Act's insured status requirement through December 31, 2014.  (*Id.* at 31).  Moving then to the first prong of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability: January 15, 2009.  (*Id.*).

Next, the ALJ concluded that Plaintiff had several severe impairments, including asthma, COPD, aortic insufficiency, mitral valve disorder, hypertension, and hypothyroidism.  (SSA Rec. 31).  Although Plaintiff also claimed to suffer from depression, the ALJ found this constituted only a non-severe impairment.  (*Id.*).  After considering the four functional areas in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ found that Plaintiff's depression caused no more than "minimal limitation in the claimant's ability to perform basic mental work activities."  (*Id.* at 31-32).

Third, the ALJ found that Plaintiff did not have any impairment or combination of impairments that met or medically equals the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (SSA Rec. 33). The ALJ made this determination by specifically evaluating listings 3.03

---

evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [her *per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

(asthma) and 12.04 (affective disorders).  (*Id.*).  Moving on to step four, the ALJ found Plaintiff had the "residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except she [had to] avoid concentrated exposure to dust, fumes, gases, extreme temperatures and allergens."  (*Id.* at 33).[18]

To establish what level of work Plaintiff was able to perform, the ALJ engaged in a two-step analysis, first deciding whether there was a medically determinable physical or mental impairment that could reasonably be expected to have caused Plaintiff's symptoms, and then assessing the extent to which the intensity, persistence, and limiting effects of Plaintiff's symptoms limited her functioning.  (SSA Rec. 33).  The ALJ subsequently stated that, if statements about Plaintiff's limitations were not substantiated by objective medical evidence, he would make a finding on the credibility of those statements based on a consideration of the entire record.  (*Id.*).

The ALJ then reviewed Plaintiff's various hospitalizations at Catskill Regional Medical Center and her visits with Dr. Garfield from 2009 to 2013.  (SSA Rec. 33-36).  The ALJ started with Plaintiff's five-day hospitalization at Catskill Regional Medical Center in September 2009, during which Plaintiff was

---

[18]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, … he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

diagnosed with asthma/COPD exacerbation.  (*Id.* at 34).  The ALJ noted

Plaintiff's September 23, 2009 echocardiogram, which revealed left ventricular

hypertrophy with preserved systolic function, a normal functioning mechanical

valve at the mitral position, severe aortic regurgitation and mild tricuspid

regurgitation with mild pulmonary hypertension.  (*Id.*).

Next, the ALJ pointed to Dr. Garfield's April 2010 pre-employment

examination of Plaintiff as "strong support that the claimant could at least

engage in light exertional work as she was cleared to work by her own treating

physician." (SSA Rec. 34).  The ALJ then summarized Plaintiff's May 2010 and

June 2011 visits to Catskill Regional Medical Center because of asthma-related

symptoms.  (*Id.*).  The ALJ emphasized that, during both visits, Plaintiff

exhibited relief after treatment with medication.  (*Id.*).

The ALJ continued, detailing Plaintiff's March 2012 follow-up

appointment with Dr. Garfield, during which he diagnosed Plaintiff with mitral

valve disorder, aortic insufficiency, asthma, hyperthyroidism, tobacco abuse,

and hypertension.  (SSA Rec. 34-35).  The ALJ noted Plaintiff's May 22, 2012

hospitalization at Catskill Regional Medical Center because of "a four day

history of moderate dyspnea and wheezing apparently precipitated by

allergies[.]" (*Id.* at 35).  The ALJ then pointed to Plaintiff's April 2013 follow-up

visit with Dr. Garfield, her first visit since June 2012.  (*Id.*).  Plaintiff exhibited

wheezing during this visit, but otherwise had a regular breathing rate and

effort.  (*Id.*).

The ALJ next discussed Plaintiff's hospitalization in June 2013.  (SSA
Rec. 35).  He noted that Plaintiff had never been intubated despite her
fourteen-year history of asthma.  (*Id.*).  He also stated that Plaintiff's chest X-
ray revealed a "mildly enlarged heart but no acute infiltrates or pleural
effusions," and Plaintiff's echocardiogram "showed a left ventricle ejection
fraction of fifty to fifty-five percent, moderate to severe aortic regurgitation and
a normal functioning prosthetic mitral valve."  (*Id.*).  The ALJ continued on to
describe Plaintiff's July 2013 visit with Dr. Garfield because of asthma
symptoms.  (*Id.*).  He recorded that Plaintiff was wheezing during her
appointment, though she exhibited regular breathing rate and effort and no
retractions.  (*Id.*).

Next, the ALJ recounted the findings of Dr. Alvarez's July 2012
consultative examination, which the ALJ described as "largely normal."  (SSA
Rec. 35).  The ALJ stated that, while Plaintiff reported difficulty walking
because of her asthma and back pain that radiated down her left leg, during
her examination Plaintiff "had a normal gait and stance and could get up on
her heels and toes without difficulty."  (*Id.*).  According to Dr. Alvarez, Plaintiff
had "no restrictions" but "should avoid smoke, dust and known respiratory
irritants due to her history of asthma."  (*Id.*).

The ALJ stated that he gave "great weight" to Dr. Alvarez's opinion
because Dr. Alvarez personally examined Plaintiff, and his opinion was
consistent with Dr. Garfield's findings.  (SSA Rec. 35-36).  Dr. Alvarez's
opinion, according to the ALJ, provided "strong support that the claimant can

engage [in] light exertional work so long as she avoids concentrated exposure to dust fumes, gases, extreme temperatures and allergens." (*Id.* at 36). By contrast, the ALJ reported to give "little weight" to Dr. Garfield's opinion because it was "poorly supported by his treatment notes[,] which found sporadic treatment and little in the way of objective findings that would support his claim." (*Id.*). Additionally, the ALJ noted that Dr. Garfield's July 2013 opinion was inconsistent with his April 2010 assessment clearing Plaintiff to work as a CNA and was not supported by Dr. Alvarez's findings in the consultative examination. (*Id.*).

As a result, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms; however, the ALJ concluded Plaintiff's statements about her limitations were not entirely credible. (SSA Rec. 36). The ALJ explained the reasons for this finding: (i) Plaintiff's activities of daily living were not limited to the extent one would expect; (ii) Plaintiff's treatment for her ailments was essentially routine and/or conservative in nature; (iii) Dr. Garfield's opinion was poorly supported by his own treatment notes; (iv) there was a question as to whether Plaintiff's continuing unemployment was actually due to her medical conditions; (v) Plaintiff did not exhibit evidence of debilitating symptoms during her testimony at her administrative hearing; and (vi) there existed inconsistent assertions regarding Plaintiff's ability to work before the Department of Labor and the Social Security Administration (the "SSA"). (*Id.* at 36-37).

Finally, the ALJ concluded that Plaintiff (i) was unable to perform any past relevant work, (ii) was a "younger individual" under 20 C.F.R. § 404.1563 and 20 C.F.R. § 416.963, and (iii) had a "limited education" but could communicate in English.  (SSA Rec. 37).  The ALJ then found that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills[.]"  (*Id.* (citing SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2)).  The ALJ considered Plaintiff's residual functional capacity along with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, to determine whether there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  (*Id.*).  The ALJ explained that if Plaintiff had the residual functional capacity to perform the full range of light work, then Medical-Vocational Rule 202.18 would dictate a finding of "not disabled."  (*Id.* at 38).  The ALJ specified that "additional limitations have little or no effect on the occupational base of unskilled light work."  (*Id.*).  The ALJ cited to SSR 85-15, which provides that "where a person has a medical restriction against excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal."  (*Id.*).  As a result of this rule, the ALJ concluded that a finding of "not disabled" was appropriate.  (*Id.*).

## F.  **Plaintiff's Appeal and the Instant Litigation**

Plaintiff requested that the Social Security Appeals Council review the ALJ's decision denying her benefits, but the request was denied on January 6,

2015. (SSA Rec. 1). Plaintiff then filed her Complaint on March 3, 2015, appealing the Commissioner's denial of her benefits application. (Dkt. #1). Plaintiff filed the instant motion for judgment on the pleadings on July 30, 2015. (Dkt. #12). The Commissioner filed her cross-motion for judgment on the pleadings on July 31, 2015. (Dkt. #14). The Commissioner filed her opposition to Plaintiff's motion on September 4, 2015. (Dkt. #16). Plaintiff filed her opposition to the Commissioner's motion on September 15, 2015. (Dkt. #17). No further submissions have been filed, and the Court therefore considers Plaintiff's September 15 memorandum as concluding the briefing.

## DISCUSSION

### A.   Applicable Law

#### 1.    Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed R. Civ. P. 12(c). A court applies the same standard to a motion for judgment on the pleadings as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). When considering either, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway*

*Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [Plaintiff's] claims across the line from conceivable to plausible.") (internal quotation marks omitted)).

> **2.    Review of Determinations by the Commissioner of Social Security**

In order to qualify for disability benefits under the Act, a claimant must demonstrate her "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Furthermore, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

The presiding ALJ has an affirmative obligation to develop the administrative record.  *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09

(2d Cir. 2009); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).  This means that the ALJ shall "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" a determination as to the claimant's disability.  42 U.S.C. § 423(d)(5)(B).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian* v. *Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 145 (2d Cir. 2012))); *see also* 42 U.S.C. § 405(g) ("If there is substantial evidence to support the determination, it must be upheld.").  Where the findings of the SSA are supported by substantial evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

24

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard." *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  To make the determination of whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

## B.     Analysis

In her motion for judgment on the pleadings, Plaintiff contends that, when the ALJ decided to give little weight to Dr. Garfield's opinion, he failed to apply the treating physician rule correctly.  (Pl. Br. 14-19).  Further, Plaintiff argues that the ALJ misstated the portion of Dr. Alvarez's opinion involving "work related function," which "affected the evaluation of nonexertional and exertional impairments and ultimately the findings of disability."  (*Id.* at 18-19). Plaintiff also states that the ALJ had a duty to follow up with Dr. Garfield regarding the inconsistencies between his April 2010 and July 2013 opinions. (*Id.* at 16-17).

In response, Defendant maintains that the ALJ appropriately applied the treating physician rule and "properly declined to accept the conclusory

statements of Dr. Garfield that Plaintiff was disabled and could not work."
(Def. Br. 15-18).  Defendant also asserts that the ALJ correctly limited Plaintiff
to jobs that did not require "concentrated exposure" to irritants, as Plaintiff's
"unabated daily smoking" is evidence that she "could tolerate some respiratory
irritants despite her asthma." (*Id.* at 18).  In response to Plaintiff's contention
that the ALJ did not adequately develop the record, Defendant argues that the
ALJ had no duty to contact Dr. Garfield to seek clarification before discounting
his opinion.  (Def. Opp. 11-13).

### 1.    The ALJ Erred in Applying the Treating Physician Rule and Failed to Develop the Record Adequately

SSA regulations provide that the medical opinions of a claimant's
treating physician should be afforded particular deference.  20 C.F.R.
§ 404.1527(c)(2).  A treating physician's opinion on the "nature and severity" of
claimant's impairments will be given "controlling weight" when it is "well-
supported by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial evidence in [the]
case record." *Id.*  The treating physician rule acknowledges that the treating
physician is "most able to provide a detailed, longitudinal picture of [claimant's]
medical impairment(s)" and may also "bring a unique perspective to the
medical evidence that cannot be obtained from the objective medical findings
alone or from reports of individual examinations, such as consultative
examinations or brief hospitalizations." *Id.*

Before an ALJ departs from the general rule that a treating physician's
opinion is entitled to controlling weight, the ALJ should consider a number of

26

factors, including (i) the "[l]ength of the treatment relationship and the frequency of examination"; (ii) the "[n]ature and extent of the treatment relationship"; (iii) the amount of relevant supporting evidence, "particularly medical signs and laboratory findings"; (iv) the opinion's consistency with the entire record; (v) whether the treating physician is a specialist; and (vi) other relevant factors. 20 C.F.R. § 404.1527(c); *see also Clark* v. *Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). The SSA's regulations require that the ALJ present "good reasons" for his decision not to give controlling weight to the treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Halloran* v. *Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion[.]"). The ALJ is not required to discuss each of these factors explicitly, so long as his "reasoning and adherence to the regulation are clear." *Atwater* v. *Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order).

Here, the ALJ failed to provide "good reasons" for privileging the opinion of Dr. Alvarez — a consultative physician — over the opinion of Dr. Garfield — a treating physician. Three of the central reasons the ALJ provided for prioritizing Dr. Alvarez's opinion were not "good reasons," as required by SSA regulations. First, the ALJ claimed that Dr. Alvarez's opinion was entitled to "great weight" because "it c[ame] from an examining source who had the opportunity to personally examine [Plaintiff]." (SSA Rec. 35). However, as the

27

treating physician, Dr. Garfield had an equal if not greater "opportunity to personally examine [Plaintiff]." (*See supra* 3-11).

Moreover, the ALJ did not identify any evidence suggesting that Dr. Alvarez had personally examined Plaintiff more thoroughly or more recently than Dr. Garfield.  To the contrary, the record suggests that Dr. Garfield thoroughly examined Plaintiff over a six-year period, and "made medical observations far more extensive than those of any other consulting physician." *Shaw* v. *Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  Furthermore, while Dr. Alvarez examined Plaintiff roughly one year before her hearing, Dr. Garfield conducted his most recent examination just a few weeks prior to the hearing date.  (*See supra* 10-11).  Thus, the fact that Dr. Alvarez "personally examine[d]" Plaintiff is not a "good reason" for prioritizing his opinion over Dr. Garfield's.

Second, the ALJ suggested that Dr. Garfield's opinion was entitled to less weight because there were some inconsistencies between Dr. Garfield's April 2010 assessment, in which he cleared Plaintiff for work, and his July 2013 assessment, in which he stated that she was totally disabled and could not work.  (SSA Rec. 36).  As an initial matter, it is worth noting that Dr. Garfield's opinions are not necessarily inconsistent: Plaintiff could have been capable of working in 2010, but her condition could have deteriorated over the next three years, rendering her completely disabled by 2013.  However, even assuming that Dr. Garfield's opinions were inconsistent, the ALJ would have had an obligation to seek additional information from Dr. Garfield to try to resolve this

inconsistency.  While an ALJ generally has discretion to "determine the best way to resolve [an] inconsistency or insufficiency" in the record, 20 C.F.R. § 404.1520b(c), he or she must seek clarification and additional information from a physician if the "physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports." *Rolon* v. *Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 504 (S.D.N.Y. 2014).  Thus, the ALJ had an obligation to contact Dr. Garfield if he believed that there were genuine inconsistencies in the reports he provided.

Finally, the ALJ suggested that Dr. Garfield's opinion was entitled to little weight because "it [was] poorly supported by his treatment notes[,] which found sporadic treatment and little in the way of objective findings that would support his claim." (SSA Rec. 36).  To be sure, the ALJ had no duty to accept Dr. Garfield's conclusion that Plaintiff was "completely and permanently disabled," as the power to make such a determination rests solely with the Commissioner.  *Snell* v. *Apfel*, 177 F.3d 128, 133-34 (2d Cir. 1999).  However, if Dr. Garfield's treatment notes were too sparse to support his conclusions, the ALJ should have asked Dr. Garfield to explain his conclusions further.  *See Kessler* v. *Colvin*, No. 14 Civ. 8201 (JPO), 2015 WL 6473011, at *5 (S.D.N.Y. Oct. 27, 2015) ("[G]iven the conclusory nature of [the physicians'] findings of disability … the ALJ should have sought additional explanation from the treating physicians[.]" (alterations in original) (citing *Aronis* v. *Barnhart*, No. 02 Civ. 7660 (SAS), 2003 WL 22953167, at *6 (S.D.N.Y. Dec. 15, 2003)))).  Because the ALJ did not adequately develop the record, he cannot cite the gaps and

inconsistencies in Dr. Garfield's reports as "good reasons" for disregarding Dr. Garfield's opinion.

### 2.    The ALJ Impermissibly Modified Dr. Alvarez's Opinion

The ALJ used Dr. Alvarez's opinion as support for the proposition that Plaintiff can "engage [in] light exertional work so long as she avoids concentrated exposure to dust, fumes, gases, extreme temperatures and allergens." (SSA Rec. 36).  In her brief, Plaintiff argues that the ALJ's insertion of the word "concentrated" into his paraphrase of Dr. Alvarez's assessment was inappropriate and "changed the meaning of the opinion." (Pl. Br. 19).  The Second Circuit has indicated that the ALJ cannot "arbitrarily substitute his own judgment for competent medical opinion." *Mariani* v. *Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (summary order) (internal quotation omitted).

The Court agrees with Plaintiff that the ALJ erred in limiting Plaintiff to work not involving "concentrated exposure" to irritants, when Dr. Alvarez's report did not include that adjective.  The lack of a qualifier signals that Plaintiff was advised to avoid exposure to *all* irritants.  Defendant argues that Plaintiff's smoking indicates that she could withstand exposure to some irritants (Def. Br. 18); however, the ALJ did not himself provide this rationale in his opinion.  Therefore, because the ALJ misstated Dr. Alvarez's conclusion, his argument concerning Plaintiff's residual functional capacity does not serve as a good reason for discounting Dr. Garfield's opinion.

30

### 3. The ALJ Should Have Sought the Testimony of a Vocational Expert

Beyond its inadequacy as a reason for discounting Dr. Garfield's opinion, the ALJ's statement containing the inaccurate language from Dr. Alvarez's report potentially had a dispositive effect on his "not disabled" finding.  At the fifth step of his analysis, the ALJ used the Medical-Vocational Guidelines to determine that there were jobs in the national economy that Plaintiff could perform.  (SSA Rec. 37-38).  However, the Second Circuit has stated that "sole reliance on the [g]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform."  *Rosa* v. *Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (alterations in the original) (internal quotation marks omitted).  If this is the case, then "the Commissioner *must* introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Id.* (emphasis added).  Since Dr. Alvarez did in fact find that Plaintiff had the non-exertional impairment of avoiding environmental irritants, with no limitation, the ALJ should have consulted a vocational expert before making his determination as to Plaintiff's disability status.

In his analysis, the ALJ specifically relies on SSR 85-15, which provides that an individual advised to "avoid excessive amounts of noise, dust, etc." would be impacted minimally because "most job environments do not involve great noise, amounts of dust, etc."  1985 WL 56857, at *8 (Jan. 1, 1985).  However, the regulation also states that there would be a "considerable" impact

31

on the range of work available to an individual who "can tolerate very little noise, dust, etc." because "very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions."  *Id.* Environmental restrictions between "very little" and "excessive … will generally require consultation of occupational reference materials or the services of a [vocational specialist]."  *Id.*  Therefore, the ALJ's addition of the word "concentrated" before the list of irritants Plaintiff must avoid may have significantly impacted his decision not to consult a vocational expert and, ultimately, his "not disabled" finding.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED insofar as it requests remand for rehearing; and the Commissioner's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      June 22, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge